# EXHIBIT "A1"

# Mark R. Cannon, P.E., CFEI's

# Curriculum Vitae

**Mark R. Cannon, P.E.**
**Augspurger Komm Engineering, Inc. & BTI Consultants**
**3315 E. Wier Avenue**
**Phoenix, AZ 85040**
**602-443-1060**
**602-443-1074 fax**
**www.akeinc.com**

## EDUCATION

Master of Science program, Advanced Safety Engineering and Management, University of Alabama
Bachelor of Science, Mechanical Engineering, Arizona State University, 1979

## EXPERIENCE

Mark Cannon has over seventeen years experience in forensic engineering and investigates a wide variety of mechanical and safety issues, including workplace injuries involving machinery, machinery failures, consumer product failures, and automotive accident reconstruction. His prior experience includes seventeen years as an engineer in the areas of research, design and manufacturing. Mr. Cannon has testified in multiple state and federal venues.

## PROFESSIONAL REGISTRATION

State of Arizona, Mechanical Engineer, #23282
Commonwealth of Pennsylvania, Mechanical Engineer, #PE057286E
State of Nevada, Mechanical Engineer, #021064
Certified Fire and Explosion Investigator, NAFI Reg. No. 13966-7402

## PROFESSIONAL AFFILATIONS

American Society of Mechanical Engineers
American Society of Safety Engineers

## PUBLICATIONS

*Assessment of Timely Lockup of Web-Sensing Restraint Retractors*, SAE Technical Paper 2002-01-1548, presented at Society of Automotive Engineers' General Aviation Technology Conference and Exhibition, Wichita, Kansas, April 2002

*Occupant Crash Protection Handbook for Tactical Ground Vehicles (Light, Medium & Heavy)*, Department of the Army, November 2000

*The Unit Maintenance Aircraft Recovery Kit*, USAAVSCOM TR-87-D20, US Army Aviation Applied Technology Directorate, Fort Eustis, VA, April 1988

*Crash Dynamics Program Transport Seat Performance and Cost/Benefit Study*, DOT/FAA/CT-85/36, Federal Aviation Administration Technical Center, Atlantic City Airport, NJ, December 1986

*Discussion of Transport Passenger Seat Performance Characteristics*, SAE Technical Paper 881378, presented at Society of Automotive Engineer's Aerotech 1988 Conference, Anaheim, CA, October 1988

*Seat Experiments Results - Full-Scale Transport Aircraft Controlled Impact Demonstration*, DOT/FAA/CT-85/25, Federal Aviation Administration Technical Center, Atlantic City Airport, NJ, December 1985

*Seat Experiments for the Full-Scale Transport Aircraft Controlled Impact Demonstration*, DOT/FAA/CT-84/10, Federal Aviation Administration Technical Center, Atlantic City Airport, NJ, March 1985

Mark R. Cannon, P.E.
Page 2 of 5

*Concepts for Improving Passenger Seats for Large Transport Aircraft*, presented at the Sixteenth Seminar, International Society of Air Safety Investigators, Phoenix, AZ, September 1985

*Improving the Survivability of Transport Aircraft Seating Systems*, presented at the International Aircraft Cabin Safety Symposium, University of Southern California, Los Angeles, CA, February 1985

## PRESENTATIONS

*Evaluation of Detection Systems for Large Mobile Equipment*, American Academy of Forensic Sciences, February 21, 2014

*Discussion of JLG Upper Lift Cylinder Pin Failures*, American Association for Justice, July 30, 2012

*Cost Effective Use of Consultants and Experts*, National Association of Subrogation Professionals, October 17, 2011

*Fall Protection Strategies in Residential Construction*, The Industrial Commission of Arizona, September 26, 2011

*Forensic Engineering*, Arizona State University, November 23, 2010

*Hail Damage to Tile Roofing*, Nationwide Insurance, October 9, 2010

*Water Loss Investigations*, Property and Casualty Adjusters Seminar, April 16, 2009

## ACADEMIC HONORS

Pi Tau Sigma – International Mechanical Engineering Honor Society
Tau Beta Pi – Engineering Honor Society

## PATENTS

Energy-Absorbing Leg Assembly for Aircraft Passenger Seats, US Patent 04911381

## SPECIALIZED TRAINING

UCSD OSHA Training Institute "Fall Protection" (OSHA 3110), San Diego, CA,  2011

Elevator and Escalator Design and Inspection – American Society of Mechanical Engineers, 2010

Investigation of Appliance Fires  –  Fire Findings LLC,  2008

Forensic Fire Scene Reconstruction – International Association of Arson Investigators, 2007

LL.M. in Trial Advocacy, Volunteer Expert - Temple University, 2004

Motor Vehicle Accident Reconstruction - Society of Automotive Engineers, 2001

Statistical Process Control in Extrusion - Society of Plastics Engineers, 1994

Computer Aided Design on Anvil 5000 System - Simula, Incorporated, 1986

Array Processing Language - I.P. Sharpe Associates, 1985

Crash Survival Investigators School - Robertson Research, Incorporated, 1984

Statistics in Manufacturing - American Telephone & Telegraph, 1982

Microprocessors in Controls Applications - American Telephone & Telegraph, 1980

Rheology of Plastics and Extrusion Principles - American Telephone & Telegraph, 1979

Mark R. Cannon, P.E.
Page 3 of 5

## EMPLOYMENT

2009 -            Augspurger Komm Engineering, Inc., & BTI Consultants, Senior Consulting Engineer

2006 - 2009      Unified Investigations & Sciences, Inc., Forensic Engineering Consultant
                 Cause and effect analyses related to consumer and industrial accidents, involving machine
                 guarding, equipment operation, structural design, failure mechanisms, and defective
                 conditions. Motor vehicle accident investigation and reconstruction.

1996 – 2006      ARCCA, Inc., Senior Engineer
                 Cause and effect analyses related to consumer and industrial accidents involving
                 machine guarding, equipment operation, structural design, failure mechanisms, and
                 defective conditions. Motor vehicle accident investigation and reconstruction.

1995 – 1996      Intesys Technologies, Senior Manufacturing Engineer
                 Provided engineering support for high-speed automated assembly and injection   molding
                 company.
                 • Developed process to ultrasonically weld and pressure-test surgical pack for
                   Alcon Laboratories.
                 • Designed assembly tooling and UV silicone curing fixture for automatic
                   transmission controller for Delphi Packard Electric.
                 • Reversed-engineered components of high-speed blade inserter and developed
                   technician training package to facilitate repairs and reduce downtime.
                 • Developed tooling fixtures to manufacture electronic module for Saturn
                   automobile.

1993 – 1995      Aquapore Moisture Systems, Engineering & Maintenance Manager
                 Designed and installed customized processing equipment, wrote instructions and trained
                 operators at a high-volume lawn and garden products manufacturing company.
                 • Developed laser hole-drilling machine, manual hose coiler, web cutter and
                   quality assurance test equipment to manufacture extruded sprinkler hose.
                 • Installed and proved-in sprinkler hose manufacturing equipment,      developed
                   manufacturing procedures and trained technicians and operators.
                 • Specified and supervised construction of production facility to house new
                   manufacturing equipment.
                 • Surveyed and selected injection molding houses to fabricate plastic
                   components.
                 • Procured and supervised installation, start-up and training for manufacturing
                   facility of Gardena© products which included sonic and spin welders, spring
                   coiler and pad printers.
                 • Developed optical comparator to facilitate quality control of extrusions

1993             Chamberlain Group, Consultant
                 Performed analyses of manufacturing problems and designed test equipment at high
                 volume garage door opener manufacturer.
                 • Performed evaluation of specifications, manufacturing, assembly and quality
                   assurance processes within factory to eliminate garage door opener failures.
                 • Designed and fabricated equipment to test garage door opener transmitters in
                   environmental chamber.
                 • Design and fabricated equipment to measure stall torque on electric motors.

Mark R. Cannon, P.E.
Page 4 of 5

**EMPLOYMENT(Continued)**

1988 – 1993    Orbital Sciences Corporation, Senior Mechanical Engineer
- Provided structural analysis support for design of Pegasus launch vehicle.
- Developed and performed test procedures for evaluating aerodynamic loads on rocket sections and explosive release testing of deployable nose sections for Ballistic Missile Office projects.
- Developed 10-ft and 17-ft parabolic antenna system to track and receive data from polar-orbiting and geosynchronous satellites for Department of Defense.
- Installed antenna systems at facilities in Chandler, Austin, and Denver. Created assembly procedures and trained Air Force personnel.
- Designed mobile launch van for meteorological sounding rockets for Spaceport Florida Authority. Transported equipment to Mexico and launched during solar eclipse.
- Developed production facility for water-activated batteries. Performed start up of equipment including pill press, inking machine, dust collector and assembly jigs. Wrote procedures and trained operators.
- Provided manufacturing support for manufacturing and assembly of meteorological radiosondes and vacuum-thermoformed Mylar balloons.

1982 – 1988    Simula Inc., Project Engineer
- Responsible for seat experiments aboard four-engine commercial aircraft crash-tested at Edwards Air Force Base. Performed structural analyses, design and qualification tests on prototype seats. Liaison to FAA, NASA and JPL for installation, instrumentation, and documentation of seats and test dummies. Analyzed posttest instrumentation and photographic data. Presented analyses results to FAA and NASA.
- Member of team comprised of FAA, U.S. Army and NTSB personnel that analyzed passenger injury and seat performance in commercial airline crashes and reported results to FAA, resulting in promulgation of stronger passenger seats.
- Member of industry committee that developed dynamic testing requirements for transport seats.
- Headed joint effort with SICMA Aero Seat to develop and market energy-absorbing commercial airline seat. Performed structural design and dynamic qualification tests. Presented technical performance data to engineers at Boeing Aircraft Co., McDonnell Douglas and FAA.
- Designed and fabricated prototype sling kit for aerial lifting downed U.S. Army helicopters. Successfully passed flight tests.
- Developed and fabricated seats for MBB BO-108 and VH-60 helicopters.

1979 – 1982    American Telephone & Telegraph, Product and Development Engineer
Product and Development Engineer – Responsible for the design, installation, prove-in, and operator training of equipment used in the cable    jacketing process. Equipment included plastic conveying systems, winders, presses and turntables. Investigated field failures of cable seals and performed in-plant studies and trained operators to reduce defects.    Worked with Bell Laboratories in performing evaluations of prototype fiber-optic sheathing materials.

Mark R. Cannon, P.E.
Page 5 of 5

## FAMILIAR TECHNOLOGIES

The items listed below have been involved in one or more of Mr. Cannon's forensic investigations. This list is not intended to be comprehensive.

Consumer Products
- rolling school gate
- home heating oil filter
- massage chair
- wood shaping table
- driver seat adjustment switch
- garage vehicle lift
- hand grinding wheel
- shower seat
- table saw guard
- garage door opener
- moving van ramp
- band saw guard
- amusement park ride restraint
- indoor folding bleachers
- water line failures
- orchard ladder
- library ladder
- spring-loaded window balance
- car battery puncture
- treadmill
- refrigerator water filters
- water hot pot
- chandelier lift

Vehicular Dynamics
- collision reconstruction
- site line analysis
- vehicle/bicyclist impact
- pedestrian/vehicle impact

Industrial Products
- conveyor belts
- warehouse storage rack system
- guardrails
- industrial blower
- aircraft engine hoist
- dual-mast forklift
- backhoe loader

- scissor lift guard
- electric pallet jack
- earth moving equipment
- three-car rollback carrier
- fall protection
- leather sammying machine
- steam modulator
- rough terrain forklift
- rolling mill laminating machine
- printing press
- blow molding machine
- pallet truck
- 3-roll calendaring machine
- paper mill pulp mixer guard
- concrete saw
- grain hauler trailer
- dock cargo sling
- pallet truck battery
- aircraft deicer
- automated paper debaler
- food steamer
- milk processing equipment
- road grinding/milling machine
- skid-steer loader guard
- skid-steer loader with brush clearing attachment
- rock drilling rig
- fire truck nozzle restraint
- thermo-vacuum forming machine
- forklift maintenance
- paper baling machine
- well drilling rig
- printing press
- forklift restraint
- dry cleaning press
- modular building jack system
- gathering/binding machine
- dough divider
- drilling rig rod transfer

Rev. 03/14

# EXHIBIT "A2"

# Mark R. Cannon, P.E., CFEI's

# Report of Opinions

1. I, Mark R. Cannon, am a degreed mechanical engineer with a professional license working on behalf of Augspurger Komm Engineering Inc. In that capacity, I was retained by counsel for the Plaintiff in the matter of Walker v. Tensor to provide forensic engineering services related to an incident that occurred on August 10, 2010 wherein Jock Walker received an injury to his foot while operating a Tensor dual binder at his employer, OFS, a manufacturer and supplier of fiber optic cable. The Tensor dual binder wraps a ribbon-like material around a bundle of several fiber optic cables.

2. This document was prepared to addresses Tensor's lack of use of a warning label, sign or instruction to protect workers from a hazardous pinch point while they operated the dual binder.

3. My professional background includes the following:

   a. As a product and development engineer at AT&T, I designed a plastic pellet conveying system and wrote operating instructions and warnings for the system. I trained the operators in the use of the system which included powered augers, limit switches, proximity sensors and pneumatic sliding gates that controlled the intake and outflow of plastic pellets used in the extrusion process. The instruction manuals, which included warnings and instructions to the operators, were created and refined through personally working directly with floor operators to ensure that the instructions were executable and the content was understandable.

   b. At Orbital Sciences Corporation (OSC), I was responsible for conducting explosive release testing of deployable nose sections for the United States Government Ballistic Missile Office. I developed the method to conduct the tests, created set-up, installation, warning and safing instructions, and data collection instructions that were

used by engineers and technicians. The warnings and instructions were safety-related, created to protect ground personnel from inadvertent pyrotechnic events and ensure the tests were conducted safely and repeatably. The instructions, warnings and test methodology were monitored and accepted by United States Air Force representatives.

c. At OSC, I was the engineer for a new production facility that manufactured water-activated batteries. This facility included the manufacture of pills comprised of a combination of hazardous materials. Operators in this facility were required to wear full personal protective clothing. I operated these machines myself. I studied and developed assembly procedures, then worked with supervisors and operators to create assembly procedures, instructions and warnings. These procedures were tested through the practical application of training operators, evaluating their understanding of the instructions, and making changes as required.

d. At Aquapore Moisture Systems, a lawn and garden products manufacturer, I developed a machine that used 50-watt carbon dioxide lasers to burn holes into sprinkler hose on an extrusion line. I designed the laser machine to incorporate safety interlocks and guards to ensure its safe operation. This laser machine was accompanied by my design of a coiler whereby operators rolled sprinkler hose into a finished product. The operators also used my design of a unique machine that cut the internal web out of the end of the hose. I selected labels that were applicable to the manufacturing equipment. I trained the operators in a bi-lingual environment and wrote the instructions and warnings for safe operation of the laser drilling machine, hose coiler, web-cutting tool and quality assurance testing. The reliability of the

2

instructions and warnings were tested by the fact that the manufacturing line successfully created hundreds of thousands of sprinkler hoses without injury to the operators.

e. As an engineer at Intesys Technologies, I developed a process to ultrasonically weld and pressure-test a surgical pack for Alcon Laboratories that was used for eye surgery. This involved proving-in the process by adjusting manufacturing parameters, developing pass/fail criteria, creating specific instructions and warnings for the operators for assembly and quality assurance, and working with the operators to refine or clarify the instructions and warnings. I designed assembly tooling and UV silicone curing fixtures for producing an automatic transmission controller for North American Truck. This included proving-in assembly techniques, writing operator instructions then training operators. My instructions were created according to ISO 9000 practices and approved by our customer,  Delphi Packard Electric Systems.

f. The process of creating warning and instructions for machine operators is akin to the Plan-Do-Study-Act proposed by Deming in 1994, and later redefined by Manuele as the Plan-Do-Check-Act cycle.[1,2]   The designer creates the tasks and objectives in operating the machine, drafts operating procedures, implements the procedures, observes and evaluates the operators interpreting the procedures, refines the procedures, then implements them again until any lack of understanding or inherent ambiguity is no longer an issue in the procedures. This is the methodology that I described earlier when I created instructions and warnings for machines.

---

[1] Deming, W. Edwards, *The New Economics for Industry, Government, Education*. The MIT Press, 1994
[2] Manuele, Fred A., "Advanced Safety Engineering Management," John Wiley & Sons, Inc., 2008

g. Because the sprinkler hose that I developed was made from extruded material that was pulled down a processing line by a capstan, there was a start-up procedure similar to that of the line that Mr. Walker was operating at the time of his injury. I also worked in the cable sheathing area at AT&T, where operators performed line start-ups that involved pulling various sheathing components together into confluence before they entered an extruder, went through a cooling trough and into a capstan. Thus, I am very familiar with start-up procedures and the challenges faced by operators in processing lines similar to where Mr. Walker was injured.

h. Besides my direct experience in the industry described above, I am currently enrolled in my fourth year in a master's program at the University of Alabama - Birmingham in Advanced Safety Engineering Management.

4. I have received and reviewed the following:

a. Tensor Fiber Optic Industries, Ltd., Request for Quotation, 09/21/99

b. Affidavit of Larry Heavner, 12/05/12

c. Description of the Tensor Dual Binder and Control Station

d. Tensor Machinery Ltd., Commercial Invoice No. 1438-0A, 11/27/00

e. Tensor Machinery Ltd, Invoice 11/27/00 re: 1438-0

f. Tensor Machinery Ltd, Invoice 11/27/00 re: 1651-0

g. Tensor Machinery Ltd Invoice 11/27/00 Lucent Brazil

h. Purchase Order, 12/15/99; P.O. AKN2718168

i. Purchase Order, 07/28/00; P.O. AKN295321

j. Defendants Tensor Machinery, LTD and Tensor Fiber Optic Technologies, Ltd's Supplemental Responses to Plaintiffs' First Interrogatories, 10/22/13

k. Defendants Tensor Machinery, Ltd and Tensor Fiber Optic Technologies, Ltd's Supplemental Responses to Plaintiffs' First Request for Production of Documents, 10/22/13

l. Tensor Fiber Optic Cable Production Technology; User's Manual for the Dual Binder, 11/00

m. Tensor Field Service Report

n. Lucent Technologies Shipping Information

o. Complaint, 08/10/12

p. Plaintiff Jock Walker's First Interrogatories and Request for Production of Documents to Defendants, 08/10/12

q. Confidentiality Agreement

r. Non-Party OFS Fitel's Amended Response to Defendant Tensor Machinery Ltd's Request for Production of Documents, undated

s. Non-Party OFS Fitel's Second Amended Response to Defendant Tensor Machinery Ltd's Request for Production of Documents, 03/26/14

t. Defendants Tensor Machinery, LTD and Tensor Fiber Optic Technologies, LTD's Notice of Rule 30(B)(6) Deposition of OFS Fitel, undated, unsigned

u. Tensor Machinery, Ltd., Commercial Invoice No. 588-0, 6/14/96

v. Photos of Warning labels

w. Tensor Machinery Ltd, Invoice

x. Purchase Order for Project 386, 12/15/99

y. Startup and Tensor Invoice & Receipt, 07/28/00

z. Tensor User's Manual for the Dual Binder, November 2000

    aa. Tensor, Request for Quotation No. 99-013-EX-JJC, 09/21/99

    bb. Description of the Tensor Dual Binder and Control Station

    cc. Email from Wayne Melnick to Charles Blaska, et al, 04/09/13 re Statute of Repose Issues

    dd. Tensor Field Service Report

    ee. Shipping information from Lucent to Tensor, 11/24/00

    ff. Tensor Field Service Report

    gg. Deposition of Jock Walker, 02/17/14

    hh. Defendant Tensor Machinery, LTD's and Tensor Technologies, LTD's Objections and Responses to Plaintiff Teneka L. Walker's First Interrogatories to Defendants, 04/30/14

    ii. Defendants Tensor Machinery, Ltd's and Tensor Technologies, Ltd's Objections and Responses to Plaintiff Teneka L. Walker's First Request for Production of Documents to Defendants, 04/30/14

    jj. Response to Non-Party discovery requests, includes CONFIDENTIAL DOCUMENTS

    kk. Non-Party OFS Fitel's Third Amended Response to Defendant Tensor Machinery, Ltd's Request for Production of Documents, 05/15/14

5. I inspected the subject Tensor machine and reviewed documents provided by Tensor and Mr. Walker's employer, OFS, and deposition transcripts.

6. The subject dual binder was designed and manufactured by Tensor and was one of a series of machines also from Tensor that comprised a stranding line at OFS. Although it was initially

sold to a company in Brazil, the condition of the dual binder at the time of Mr. Walker's incident in Georgia was substantially the same as it was originally sold by Tensor.

7. The binder wraps individual colored fiber optic strands together as they come out of an oscillator. Each strand feeds off a bobbin at the beginning of the line, and part of the start-up procedure is for the operator to collect the different strands into a single starting point before they travel into the binder (Photos 1 and 2 – the line travels left to right). This requires exertion in pulling the strands and the operator may place their foot on the binder track shaft or rail for leverage (Photos 3 and 4).



Photos 1 and 2 – Strands of different colored fiber optic cables going from oscillator into binder.



Photos 3 and 4 – Demonstration of foot positioned on binder track shaft

8. The binder moves left and right on the binder track rail. The control to move the binder is in the center of the machine – to the operator's right. When starting up the line, the operator

moves the binder to the right, away from the oscillator, to give themselves room to work while pulling the individual strands into position, prior to feeding into the binder. They may shift the binder using the control buttons such as Retract and Extend to move the machine left then right in order to facilitate getting the line prepared to start.

9.  Tensor's user's manual for the dual binder does not have any specific instructions or warnings as to where the operator is to stand or position their body while working with the binder during start-up or normal stranding operations.

10. There is an orange/black/white warning label on the oscillator end of the binder shown in photos 2, 3 and 4 above and a yellow guard rail. At the time of Mr. Walker's injury, neither the warning label nor the guardrail were present.


### *DEPOSITION OF JOCK WALKER*

11. Jock Walker is the plaintiff. His description of the start-up and operating procedures for the dual binder from his testimony follow with page numbers denoted.

    a.  He received training on the binder by shadowing another operator named Janice. [32]

    b.  Sometimes you have to brace yourself to get the line started. He recalls other people bracing themselves by putting their foot on the shaft. [36]

    c.  That's how Janice showed him to use the machine. She would brace herself with her foot on the shaft to feed the line. Sometimes on, sometimes off. It just depended on what kind of setup she was running. [37]

    d.  At the time of the incident, he was having the binder move left, toward him, until it was to arrive at a set point, where it would stop and he would put tape on the cable. [81]

e. The binder would typically come toward him on the shaft where, even with his foot on the shaft, the binder would stop at the set point and not do anything to his foot. [82]

f. He and other workers at OFS would put their foot on the shaft and the machine would always stop, not catching their foot. [102]

g. He was never told that putting his foot on the shaft was improper or dangerous. [103]

h. On the day of the incident, he was holding down the Retract button on the binder and waiting for it to move to the set point, after which, he would pull his foot off [the shaft], tape down [the cable] and start [the line] up. That particular time, he was holding down the retract button and the binder kept coming past the set point, so his whole foot got stuck in there. He hit the E-stop button and was trying to pull his foot out, but by that time, it caught the other half of his foot. [104]

i. On that day, prior to his incident, he had done about six to seven start-ups and each time everything appeared to be normal. The binder did what it was supposed to do. [115-116]

j. He had pushed the E-stop at other times, prior to this event, and it shut the whole line down. [141]

k. He disagrees with the Accident Report that noted he was "taking an unsafe position or posture" because that is what he was taught to do and saw everybody else do it. People started the line like that and nothing ever happened. [143-144]

l. He did not think it was unsafe to have his foot there. [145]

m. If the pinch point warning had been there, he would have taken a different approach. [157]

9

n.  At the time, he thought he was doing the right thing to get the job done. [167]

o.  He always did his job the safest way. He would never put himself in harm's way. [169]

12. Under normal operation, the space where Mr. Walker had his foot remained wide enough to accommodate it after the binder shifted  because the binder always stopped at the set point. However, on the day Mr. Walker was injured, the available information indicates an anomaly occurred in the binder control system and it continued past the set point and crushed Mr. Walker's foot. Mr. Walker's answers regarding his knowledge of the pinch point must be viewed in the framework of his post-incident awareness that the binder had the capability of malfunctioning and creating a pinch point.

13. During my inspection of the binder on March 28, 2014, I observed that when the binder shifted to the left, closer to the oscillator, it moved to its full extent and stopped against the shaft support mounted to the floor, and did not leave any room for a foot. Although this demonstration was not consistent with Mr. Walker's description of the binder's normal operation, the movement I observed may have been caused by an adjustment that occurred at OFS after Mr. Walker's incident. In either case – whether from normal operation or a malfunction – complete travel of the binder to the shaft support creates a pinch point.

14. The Code of Federal Regulations, 29CFR1910.211(d)(44) defines a pinch point as "*any point other than the point of operation at which it is possible for a part of the body to be caught between the moving parts of a press or auxiliary equipment, or between moving and stationary parts of a press or auxiliary equipment or between the material and moving part or parts of the press or auxiliary equipment*." Because OSHA defines a pinch point as a hazard, workers or operators of a machine that has a pinch point shall be protected from that

10

hazard, according to federal law cited in 29CFR1910.212, <u>General Requirements for All Machines</u>.

15. The actions necessary for mitigating the hazard of a pinch point is addressed by using the following hierarchy of controls:[3]

    a. Eliminate the hazard entirely.

    b. Control the hazard by enclosing or guarding it at its source.

    c. Train personnel to be aware of the hazard and to follow safe procedures via instructions or labels to avoid it.

    d. Prescribe personnel protective equipment for personnel to shield them against the hazard.

16. At the time of Mr. Walker's incident, the binder did not have a warning or instruction that would alert him about the pinch point created by the binder.

17. Prior to the design of the binder, there were writings and methodologies available to Tensor to cause them to foresee the existence of the pinch point. The National Safety Council recommended as early as 1974 that a hazard analysis of a machine occur before being placed on the factory floor:

> *If there are any defects in the design of a piece of machinery, it is usually only a matter of time before it fails and an accident ensues. Therefore, all possible faults in the design of equipment and all possible hazards in the work area of a machine, as well as the physical and mental capabilities of the operator, should be studied in advance for the purpose of establishing a safe work environment.*
>
> *An advance analysis can be based on the following considerations:*
> 1. *Operational job analysis should include a survey of the nature of the task, the work surroundings, the location of controls and instruments, and the way the operator performs his duties.*
> 2. *A functional concept of accidents is implied: that is, the errors that may occur while the operator is working on the machine are anticipated. The*

---

[3] Accident Prevention Manual for Industrial Operations, National Safety Council, Seventh Edition, ISBN 0-87912-024-X, 1974

> *repetition or recurrence of near or real accidents clearly indicates a need for redesign.*
>
> 3. *From the "human limitations" point of view, it should be assumed that no worker is perfect. In fact, he may be far below the ability adjudged by the machine designer.*

Before the binder was manufactured, the American National Standards Institute (ANSI) published a standard to "*establish performance requirements for the design, construction, care, and operation of guards, devices and methods used to safeguard machine tools*"[4] The standard assigns responsibilities to the "*safety equipment manufacturer, the machine tool builder, the modifier, the employer, and the owner*" of the equipment. It further states that the "*standard is not intended to replace good judgment. Operator skill, training, experience, job monotony, and fatigue are all safety factors that must be considered.*"[5]

At the time the binder was sold by Tensor, there were methodologies available such as Failure Mode and Effects Analysis (FMEA) that would allow Tensor to foresee and evaluate the effects of potential failure modes that may result in an undesired system hazard and thereby be used for a hazard analysis which would identify the pinch point created on the binder either through normal machine settings or failure of the control software.[6] As noted in Professional Safety in 1981, in order to assemble the data necessary for safety labels, FMEA can be used to "*systematically identify, analyze and document failure modes and effects on system performance and personnel safety.*"[7] The National Safety Council writes that "*the experience of many industrial organizations has proved again and again that the best time to safeguard a machine or process is in the design stage*"[8] and "*if there are any defects in the*

---

[4] American National Standard for Machine Tools, ANSI B11.19-1990 (R1996)
[5] Ibid.
[6] Paraphrased from Ericson, Clifton A., "Hazard Analysis Techniques for System Safety," John Wiley & Sons, Inc., 2005
[7] Riley, Michael W., et al., *Warning label design*, Professional Safety, ASSE, October 1981
[8] Accident Prevention Manual for Industrial Operations, National Safety Council, Seventh Edition, ISBN 0-87912-024-X, 1974

*design of a piece of machinery, it is usually only a matter of time before it fails and an incident ensues."* [9] Tensor was required to foresee then safeguard operators from hazards posed by the binder and stranding line through, at a minimum, the use of labels and instructions, of which the machine had neither that addressed operator standing position or posture or the pinch point posed by the binder. Guidance for communication with operators via labels comes from ANSI Z535.4, American National Standard for Product Safety Signs and Labels (1991), which "*sets forth a hazard communication system developed specifically for product safety signs and labels.*" Examples of signal words, hazard descriptions and labels were provided in the standard for Tensor to use to forewarn the operators of the binder about the pinch point.

18. The situation in which Mr. Walker found himself on the day of his incident was at a confluence of various elements that were described by James Reason in the following quote:

> *Latent conditions, such as poor design, gaps in supervision, undetected manufacturing defects or maintenance failures, unworkable procedures, clumsy automation, shortfalls in training, less than adequate tools and equipment, may be present for many years before they combine with local circumstances and active failures to penetrate the system's layers of defenses.*[10]

In Mr. Walker's situation, he was not provided any procedural training or instructions by Tensor as to how to start up the stranding line system that Tensor designed and manufactured. Without any guidance from Tensor, the procedures and methods that the employees at OFS used for years was what worked best for them and facilitated their job. The Tensor binder had an undetected defect that was foreseeable to Tensor but was unknown to the workers on the stranding line. There is no information from Tensor that they performed a hazard analysis on the binder so the potential pinch point caused by the binder, whether

---

[9] Ibid.

[10] Managing the Risks of Organizational Accidents, Reason, James, Ashgate Publishing Limited, 1997

through normal adjustment, misadjustment, or software failure, was left undetected until the day of Mr. Walker's incident. As the designer and manufacture of the binder, it was Tensor's duty to foresee hazards on the machines as directed by the National Safety Council and ANSI and then protect the users of the machine from the pinch point. At the very least, out of an abundance of caution, Tensor should have provided a warning and instruction and not assumed, for whatever reason, that the users of the machine would know about the pinch point. Having that knowledge was Tensor's job and it was their duty to mitigate the hazard.

19. The analyses and opinions expressed are based on information currently available and I reserve the right to revise and/or supplement this affidavit as additional information is received, or becomes available and is reviewed. Any and all documents related to this case, including (but not limited to) photographs, videos, exemplar artifacts and/or components shall be considered part of this affidavit and may be used at trial, should that become necessary.

*exp. 6/30/2014*

Mark R. Cannon, P.E.
Senior Consulting Engineer
Augspurger Komm Engineering, Inc.

14

# EXHIBIT "A3"

# Mark R. Cannon, P.E., CFEI's

# List of Cases

**Testimony Listing for Mark Cannon**

| Case Style | Jurisdiction | Cause # | Date | Type | AKE /BTI Case# |
|---|---|---|---|---|---|
| Burdick vs. Jensen Swing Products, et al. | Second Judicial District Court of Weber County, Utah | Civil No. 110905000 | 4/4/14 | D | 13-157X |
| Bryan Moore vs. Joe Parham, et al. | Superior Court of Arizona, County of Mohave | CV2013-00175 | 3/14/14 | D | 13-576X |
| Colby Smith vs. Michigan Pallet, Inc., et al. | State of Michigan, Circuit Court Lenawee County | 11-4180-NO | 3/6/14 | D | 12-517X |
| Magruder vs. Stafford and Pulte Building Systems | District Court Clark County, NV | NO:A10632218 Dept. VIII | 2/27/14 | T | 11-806X |
| Wiley vs. Fitness International, LLC | Superior Court of Arizona, County of Maricopa | CV2012-095787 | 12/19/13 | D | 13-553X |
| Deasey vs. Bud's Drapery Den, Rollease Inc. and Newell Inc. | Superior Court of Arizona, County of Pima | C2011-5784 | 5/14/13 | D | 13-515X |
| Lea vs. Montana Refining Company | Montana Eighth Judicial District, Cascade County | BDV-12-0132 | 3/12/13 | D | 12-511X |
| Magruder vs. Stafford and Pulte Building Systems | District Court Clark County, NV | NO:A10632218 Dept. VIII | 11/7/12 | D | 11-806X |
| Matos, et al. Samuel vs. Tcom, LP, et al. | U.S. District Court for the District of Arizona | CV11-2175-PHX-FJM | 9/12/12 | D | 11-557X |
| Campbell v. HEB Grocery Company LP and Assembled Products Cor | County Court at Law Number Four, Nueces County, Texas | 09-62356-00-0-4 | 8/10/12 | D | 12-101X |
| Walker v. Hertz Equipment Rental Corporation and JLG Industries | Superior Court of Arizona, County of Maricopa | CV2011-006996 | 7/23/12 | D | 12-512X |
| Key, Willie vs. Sunsouth, L.L.C., et al. | Circuit Court of Barbour County, Alabama | CV 2010-900029 | 5/11/12 | D | 11-024X |
| Key, Willie vs. Sunsouth, L.L.C., et al. | Circuit Court of Barbour County, Alabama | CV 2010-900029 | 4/27/12 | D | 11-024X |
| Harvey, Janet vs. Phoenix Aiport Marriott, et al. | Superior Court of Arizona, County of Maricopa | CV2006-017148 | 3/21/12 | T | 10-552X |
| Whitney vs. SBC, Inc., et al. | Superior Court of Arizona, County of Maricopa | CV 2010-021873 | 1/30/12 | D | 10-015X |
| Ghirardelli Chocolate Company vs. Duhig Stainless, et al. | Superior Court of the State of CA, County of Alameda | HG10 527624 | 12/8/11 | D | 09-155X |
| Anunciacao vs. Caterpillar, Inc., et al. | U.S. District Court, District of Massachusetts, Civil Action | 1:07-cv-10904-MLW | 11/30/11 | T | 09-512X |
| Anderson vs. American Crystal Sugar Company, et al. | U.S. District Court, District of Montana, Billings Division | CV-10-77-BLG-RFC | 9/29/11 | D | 11-516X |
| Franz, Dennis & Joanie vs. Aladdin Light Lift, et al. | Idaho First Judicial District Court, Kootenai County | CV-09-5669 | 9/21/11 | D | 10-094x |
| Mesch, Terrance v. Hyster Company d/b/a NACCO, et al. | District Court Clark County, NV | NO:A570429/Dept. XX | 7/28/11 | D | 09-559x |
| Harvey, Janet vs. Phoenix Aiport Marriott, et al. | Superior Court of Arizona, County of Maricopa | CV2006-017148 | 7/21/11 | D | 10-552X |
| Winters, Eugene vs. Encore Operating, L.P., et al. | Montana Thirteenth Judicial District Court, Yellowstone Cty | DV-10572 | 7/14/11 | D | 11-515X |
| Guzman, Danny vs. Husqvarna Construction Products | Superior Court of CA, County of San Diego, Central Div. | 37-2009-00093755-CU-PL-CTL | 1/27/11 | D | 10-069T |
| Walker v. Gipa, Incorporated | Yavapai County Superior Court, State of Arizona | Case No. 20091421 | 7/9/10 | D | 09-171x |
| Anunciacao vs. Caterpillar, Inc., et al. | U.S. District Court, District of Massachusetts, Civil Action | 1:07-cv-10904-MLW | 3/17/10 | D | 09-512X |

# EXHIBIT "A4"

# Mark R. Cannon, P.E., CFEI's

# Fee Schedule and Invoice

## FEE SCHEDULE, ENGINEERING & EXPERT SERVICES
All hourly rates are billed at 1/4 hr. minimum

| | |
|---|---|
| Professional Engineer / Senior Consulting Engineer | $275.00/hr |
| Engineering Consultant | $180.00/hr |
| Architect | $275.00/hr |
| Electrical Engineering Consultant | $200.00/hr |
| Fire Investigator | $200.00/hr |
| Design Engineer | $135.00/hr |
| Founding Engineer | $325.00/hr |
| Depositions & Courtroom Time | $350.00/hr |
| Research Specialist/Technician | $ 95.00/hr |
| Administrative | $ 60.00/hr |
| | |
| Mileage | $    .555/mile (or Federal mandated rate) |
| | |
| Expenses | At cost plus 20% |
| Photographs | $   1.00/photo |
| Microscopic and x-ray photos | $ 22.00/photo |
| CAD Photos (reprints) | $ 10.00/photo |
| Professional Liability Insurance (percentage of consulting fees) | 1.7% |
| Storage of Property | Varies with size and volume |

08/01/12



# THE BLASKA LAW FIRM
### ATTORNEYS AT LAW

BUILDING 15
NORTHRIDGE 400 OFFICE PARK
8565 DUNWOODY PLACE
ATLANTA, GEORGIA 30350-3347

THOMAS C. BLASKA
T. CHARLES BLASKA
JENNIFER D. HAMILTON

TELEPHONE 770/998-1005
TOLL FREE 877/871-0750
FACSIMILE 770/998-2834

October 24, 2013

Barbara Desmond
Accounting Manager
BTI Consultants
3315 East Wier Avenue
Phoenix, Arizona 85040

**RE:    BTI File 11-517X, Stranding Machine-Walker**
*Jock L. Walker et al. v. Tensor Machinery, Ltd. et al.*; **United States District Court,
Northern District of Georgia, Newnan Division; CAFN 3:12-CV-00175-TCB**

Dear Ms. Desmond:

Enclosed please find a copy of the executed Consulting Agreement and retainer check in the amount of $2,500.00 for expert Mark Cannon's expert services in the above-referenced matter.   Please let me know if you require anything further.

With best regards, I remain,

Very truly yours,

THE BLASKA LAW FIRM

T. Charles Blaska

Enclosures

*With Engineers Licensed by the Board of Professional Engineers
in the States of Arizona, California, Colorado, Nevada, New Mexico,
Pennsylvania, Texas, Utah, Washington and the Province of Alberta*



CONSULTANTS
www.BTIC.com

BTI File 11-517X
Stranding Machine - Walker

October 24, 2013

T. Charles Blaska
The Blaska Law Firm
Northridge 400 Office Park
8565 Dunwoody Place, Bldg. 15
Northridge 400 Office Park
Atlanta, GA  30350-3347

Dear Mr. Blaska:

This letter acknowledges your request and Applied Forensic Sciences, LLC dba BTI Consultants' [BTI] acceptance of technical consulting activities on the above referenced case. We have found that it is valuable to review cost considerations with new clients at the initiation of our work so that we can best fulfill your needs.

Please be advised it is BTI's general policy to require a retainer prior to commencement of work. In this case, BTI asks that a retainer in the amount of $2.5– be returned along with the Consulting Agreement.

Applied Forensic Sciences, LLC dba BTI Consultants is incorporated in the State of Arizona. Our EIN is 26-1242388.

A Consulting Agreement is also enclosed for your signature that we require for each new case. Although initiation of work may have begun based on initial contact, continued pursuit of this case may be delayed until the retainer fee and Consulting Agreement are received. It is important to note that it is BTI's policy to not begin work until the retainer and signed Consulting Agreement are received.

We expect that we will remain in communication with each other to determine the work scope to ensure that you are in agreement with costs to complete the work you require. For example, costs for travel, field study, graphics, model building and formal reports will be reviewed, when possible, in advance of expenditures. Airline and hotel arrangements are to be prepaid. Our office will provide you with information needed to guide you in making these expenditures. It is your responsibility to keep us informed of case status, particularly if you desire that we do not perform services during any period of time. Unless you direct otherwise, we will perform our services as we deem necessary and appropriate.

Please call us to discuss any questions you may have about cost control and billing information you receive. We appreciate your confidence in using BTI in this case and expect to fully meet your needs for technical assistance.

Very truly yours,

Barbara Desmond
Accounting Manager

*With Engineers Licensed by the Board of Professional Engineers
in the States of Arizona, California, Colorado, Nevada, New Mexico,
Pennsylvania, Texas, Utah, Washington and the Province of Alberta*



CONSULTANTS
www.BTIC.com

October 24, 2013
BTI File 11-517X
Stranding Machine - Walker
Page 2 of 6

## CONSULTING AGREEMENT

### FEE SCHEDULE

Our engineers bill at rates from $200 to $325 per hour for technical work, dependent on task and experience level. Deposition and courtroom testimony is $350 per hour. In addition, we have a support staff which bills at rates from $60 to $95 per hour. We utilize our support personnel as appropriate to provide value while maintaining quality.

A complete list of our fees is attached.

Time billed shall include all time relative to the case at hand, including preparation time, court waiting time, stand by, and travel time portal-to-portal. The client agrees to pay for all time expended by BTI, including but not limited to the time incurred prior to the execution of this Consulting Agreement.

When products or information such as depositions, historical summaries and references are forwarded to BTI, time will be expended in reviewing and examining these materials and charged as a client cost. Also, the cost of all work, including but not limited to, case analysis, review of depositions and discovery materials, examination and inspection of materials and exemplar products, development of work product, site visit preparation and pre-deposition development will be the responsibility of the client.

In the event that BTI's consulting personnel are deposed or required to testify before a court or administrative tribunal by the opposition through subpoena or otherwise, the client shall be fully responsible and agrees to pay any charges or costs thereby generated in the same manner as if the client had placed the order for such services. BTI makes no guarantee regarding the outcome of any investigation or case and all expressions relative hereto are matters of opinion only.

### STANDARD OF CARE

Services provided by BTI under this Agreement will be performed in a manner consistent with that degree of care and skill ordinarily exercised by members of the same profession currently practicing under similar circumstances.

### RIGHT TO RETAIN CONSULTANTS

BTI may use the services of subconsultants when, in BTI's sole opinion, it is appropriate and customary to do so. Such persons and entities include, but are not limited to, surveyors, specialized consultants and testing laboratories. BTI's use of other consultants for additional services shall not be unreasonably restricted by the client provided BTI notifies the client in advance.

October 24, 2013
Stranding Machine - Walker
BTI File 11-517X
Page 3 of 6

---

INFORMATION PROVIDED BY OTHERS

BTI shall indicate to the client the information needed for rendering of services hereunder. The client shall provide to BTI such information as is available to the client and the client's consultants and contractors, and BTI shall be entitled to rely upon the accuracy and completeness thereof. The client recognizes that it is impossible for BTI to assure the accuracy, completeness and sufficiency of such information, either because it is impossible to verify, or because of errors or omissions which may have occurred in assembling the information the client is providing. Accordingly, the client agrees, to the fullest extent permitted by law, to indemnify and hold BTI and BTI 's subconsultants harmless from any claim, liability or cost (including reasonable attorneys' fees and costs of defense) for injury or loss arising or allegedly arising from errors, omissions or inaccuracies in documents or other information provided by the client to BTI.

SPECIALIZED TESTING, INVENTIONS, MATERIALS/EVIDENCE STORAGE

Charges for test equipment or specialized laboratory services will be billed at cost, plus 20%. Materials/evidence requiring storage will be charged at rates commensurate with volume. Insurance for stored materials/evidence is the client's responsibility.

BTI shall retain full ownership of all rights in ideas, inventions, works of authorship, confidences, or other intellectual property that are developed by BTI or its employees, whether or not such are related to, the result of, or the subject of this investigation or project.

OTHER PROJECT EXPENSES

Travel and personal expenses are charged at cost, plus 20%. Airfare and hotel are to be prepaid unless otherwise arranged. Special project expenses, unless prepaid, are charged at cost, plus 20%. These include materials, equipment, special printing and reproduction, shipping charges, special fees, extra insurance, etc.

Costs incurred by BTI to provide discovery information for the client or an adversary in a litigated matter will be billed to the BTI client and payment will be required at the time of delivery, as set forth in A.R.S. § 12-351. If depositions are to be paid by the opposing party, they must be paid in full at the conclusion of the deposition. The client guarantees the performance of the opposing party and agrees to pay the fees and costs described herein if not otherwise paid by the opposing party.

RETAINERS

In general, retainers requested by BTI will be held by BTI, without interest, and generally will be applied against the final bill for BTI's services for the case to which the retainer applies. At BTI's election, BTI may apply the retainer balance, in full or part, to fees and costs as they are billed. Any unexpended retainer balances will be returned to the client. Unless otherwise agreed by BTI and client, if retainer amounts are applied to any invoice, client agrees to replenish and restore the retainer to the original amount. BTI may request additional retainer amounts in the future if, in BTI's sole judgment and discretion, they are necessary, and/or if BTI is scheduled to testify in a deposition or trial. BTI reserves the right to suspend or discontinue services or otherwise withdraw from any further association with the client until a requested retainer has been received.

October 24, 2013
Stranding Machine - Walker
BTI File 11-517X
Page 4 of 6

_____

BILLING AND PAYMENT

Invoices will be submitted monthly. Invoices are due upon receipt. All bills are to be paid in full in advance of deposition or trial testimony. To enable BTI to remain objective, payment is not contingent upon the results of litigation settlements or jury awards. Further, there is no guarantee that BTI's findings will provide useful results in this matter. The party initiating or commissioning BTI work is the BTI client and will be responsible for payment to BTI. Third parties, such as contractor clients, litigants, insurance companies, adversary depositing attorneys and industrial corporations/commissions are not to be considered the responsible paying party without written agreement by BTI.

It is understood that BTI reserves the right to withdraw from any further association with the client in the event the client fails to pay monthly billing when due or fails to replenish the retainer as set forth herein. Further, client agrees that BTI will not testify by deposition or make a court appearance unless the client has paid all outstanding invoices in full. BTI will not be liable for delays or damages arising from work stoppage based on unpaid invoices.

In the event that BTI does not receive any inquiry from client within 30 days after the date of BTI's billing statement, client hereby agrees that client has reviewed same and found the statement to be acceptable. If payment is not received at BTI within 45 days from the invoice date, a finance charge will be added as of the billing date, at an interest rate of 1 3/4 percent (1.75%) per month, which is reducible to the maximum permitted by the state in which the client resides. Fees are subject to change without notice.

If BTI does not receive payment when due, and if BTI gives the account to its attorneys for collection, client agrees that it will pay BTI's attorneys' fees and costs incurred to collect unpaid balances (even if arbitration or litigation is not required), and client agrees to pay those fees and costs upon demand by BTI.

DISPUTE RESOLUTION

This Consulting Agreement shall be construed and enforced according to the laws of the State of Arizona. Except as set forth below, any action in regard to this Consulting Agreement or arising out of its terms and conditions shall be instituted and litigated in the courts of the State of Arizona and in no other. Accordingly, the parties submit to the jurisdiction of the courts of the State of Arizona. The prevailing party shall be entitled to its reasonable attorneys' fees and costs.

BTI may demand that any dispute in connection with this Consulting Agreement be arbitrated, and client hereby submits to binding arbitration if so demanded. Unless otherwise set forth herein, arbitration shall be conducted pursuant to JAMS Streamlined Arbitration Rules and Procedures. Arbitration shall occur in Phoenix, Arizona and for this purpose each party expressly consents to such arbitration in such place. The arbitrator shall have the right to grant any relief he or she determines to be appropriate under the circumstances, including, without limitation, money damages, specific performance, injunctive relief or an award of legal fees and costs. Judgment on any arbitration award may be entered in any court having jurisdiction. Pursuant to a written demand for arbitration, BTI shall provide client a list of three potential arbitrators, and client shall select the arbitrator from the list provided. For any dispute submitted to arbitration, EACH PARTY TO THIS CONSULTING AGREEMENT EXPRESSLY AGREES TO ARBITRATION AND WAIVES ANY RIGHT TO TRIAL BY JURY SUCH PARTY MAY HAVE UNDER EITHER FEDERAL OR STATE LAW. If arbitration proceedings are initiated under this Consulting Agreement, each of the parties shall have, for a period not to exceed one hundred twenty (120) days, all rights of discovery that are afforded parties to a lawsuit under Rules 26 through 37 of the Federal Rules of Civil Procedure and the arbitrator (or arbitrators) shall have the same rights and powers to conduct discovery as provided by the Federal Rules of Civil Procedure. Any arbitrator shall have the same power to issue orders and impose sanctions for failure to make discovery as may be exercised by a United

October 24, 2013
Stranding Machine – Walker
BTI File 11-517X
Page 5 of 6

States District Court Judge sitting in the District of Arizona. In addition, each of the parties shall have the same right to subpoena documents from third parties as such parties would have if an arbitration had been initiated as a civil suit in the United States District Court for the District of Arizona.

The party prevailing in any arbitration shall be entitled to payment of all legal fees and all costs of arbitration, including the arbitrator(s)' fees, regardless of whether such costs are recoverable under applicable law, including, without limitation, costs of investigation and expert witness fees.

TERMINATION

Either party may terminate this Consulting Agreement for any reason upon ten (10) days prior written notice to the other party. Upon termination, BTI will stop work promptly and send the client an invoice for any remaining fees and costs. Notwithstanding the foregoing, if BTI has not received a payment when due, BTI, in its discretion, may stop work immediately and prior to giving notice of termination to the client.

CONFIDENTIALITY

BTI agrees to keep confidential and not to disclose to any person or entity, other than the client, any data and information not previously known to and generated by BTI or furnished to BTI and marked CONFIDENTIAL by the client. These provisions shall not apply to information in whatever form that comes into the public domain, nor shall it restrict BTI from giving notices required by law or complying with an order to provide information or data when such order is issued by a court, administrative agency or other authority with proper jurisdiction, or if it is reasonably necessary for BTI to defend itself from any suit or claim.

The Blaska Law Firm

By: _____          10/24/2013
     Client's Authorized Signature          Date

_T. Charles Blaska_
Print Name

By: _____          10/24/13
     David S. Komm, PE, PEng              Date
     President, BTI Inc.

October 24, 2013
Stranding Machine - Walker
BTI File 11-517X
Page 6 of 6

## FEE SCHEDULE, ENGINEERING & EXPERT SERVICES
All hourly rates are billed at 1/4 hr. minimum

| | |
|---|---|
| Professional Engineer / Senior Consulting Engineer | $275.00/hr |
| Professional Engineer / Consultant | $200.00/hr |
| Architect | $275.00/hr |
| Commissioning and Design Work | $150.00/hr |
| Founding Engineer | $325.00/hr |
| Depositions & Courtroom Time | $350.00/hr |
| Research Specialist/Technician | $ 95.00/hr |
| Administrative | $ 60.00/hr |
| | |
| Mileage | $   .555/mile (or Federal mandated rate) |
| Expenses | At cost plus 20% |
| Photographs | $  1.00/photo |
| Microscopic and x-ray photos | $ 22.00/photo |
| CAD Photos (reprints) | $ 10.00/photo |
| Professional Liability Insurance (percentage of consulting fees) | 1.7% |
| Storage of Property | Varies with size and volume |